# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. DAMIEN NEELY

### Direct Appeal from the Criminal Court for Shelby County
### No. 09-03073    Paula Skahan, Judge

### No. W2010-01128-CCA-R3-CD  - Filed August 24, 2011

A Shelby County jury convicted the Defendant, Damien Neely, of facilitation of second degree murder, and the trial court ordered him to serve twelve years in the Tennessee Department of Correction.  On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to exclude recorded telephone calls he made from jail; (2) the evidence is insufficient to support his conviction; and (3) the trial court erred in applying to his sentence enhancement factor (9), pursuant to T.C.A. § 40-35-114, that the Defendant possessed or employed a firearm during the commission of the offense.  After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Harry E. Sayle, III, Memphis, Tennessee, for the Appellant, Damien Neely.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Doug Carriker and Kate Edmands, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the shooting death of the victim, Eddie Gaines, outside his apartment building on November 5, 2008.  Based on these events, a Shelby County grand jury

indicted the Defendant for second degree murder.[1]  At trial the following evidence was presented:  Eddrick Williams, a Memphis Police Department officer, testified that after 12:30 a.m. on November 5, 2008, he responded to a "man down" call at Graceland Farms Apartment complex in Memphis, Tennessee.  When he arrived, Officer Willliams saw the victim lying on the ground in front of an apartment building, covered with a blanket, and surrounded by a crowd of twenty to thirty people.  The victim was lying near the rear left tire of a car, and Officer Williams saw one bullet hole in the rear left tire and another in the body of the car directly above the victim's body.

Officer Williams testified that he approached the crowd surrounding the victim and asked if anyone knew the victim or had any information about what had occurred.  Initially "everyone" denied knowing anything, so Officer Williams advised everyone to leave the scene.  As people were leaving, Officer Williams said to the dispersing crowd that he could not believe that no one was going to identify the victim and that not one person present knew any information about what had occurred.  At that point, two men stepped forward and admitted that they had some information.  Officer Williams testified that the two men were immediately separated and placed in different patrol cars.  The men provided their names, Frederick Brooks and Clifford Fowler, and the victim's name.  Based upon this information, police officers attempted to retrieve information regarding the victim while waiting for detectives to arrive.

On cross-examination, Officer Williams testified that Brooks and Fowler told him that the victim had been involved in a gambling game and a robbery earlier in the evening.  The men told Officer Williams that the "four or five" victims of that robbery would "probably be" the "suspects" in this shooting, but they did not provide any further information about these individuals.  Officer Williams testified that he also spoke with the victim's girlfriend at the scene.  The victim's girlfriend told Officer Williams that the victim was in their apartment, received a phone call requiring him to leave the apartment, and, when he left, she fell asleep and only awoke when she heard gunshots.

Frederick Brooks testified that in November 2008, he lived in a second-story apartment in Graceland Farms next-door to the victim.  From a photograph, Brooks identified his own car  as being the car pictured with bullet holes in it that was next to the victim when he was lying on the ground.  Brooks recalled that he returned to his apartment on the night of November 4, around 8:00 p.m. or 9:00 p.m. and found the victim outside his second-floor apartment cooking chicken on a grill.  Brooks joined the victim, and the men sat, talked, and

---

[1]  The grand jury also indicted the Defendant for employing a firearm during a felony in connection with this case.  This charge was never presented to the jury, and the State ultimately entered a nolle prosequi for this count of the indictment.

drank for awhile. Around 10:00 p.m. Brooks, the victim, and two other men began shooting dice. They played for about twenty minutes, until they learned of another dice game downstairs. Brooks had run out of money, so he returned to his apartment, but the three other men joined the game downstairs. Brooks testified that when he later stepped back out of his apartment to smoke a cigarette, he saw a man come around the corner of the building with a gun and order the six or seven men who were playing the dice game downstairs to take off their clothing. Brooks ran back into his apartment but continued to watch the armed man through his window blind. Brooks observed all of the men who had been playing dice remove their clothing. He then watched as the armed man took the players' money and clothes and ran off. Brooks said that police were called and took a report of this robbery.

Later, after the police left, the victim asked Brooks if he would give the victim's brother a ride home. Brooks agreed and all three men got into Brooks's car and took the victim's brother home. On their way back, Brooks and the victim stopped and bought beer. When they arrived at the apartment complex, Brooks and the victim each went to their own apartment but agreed to meet back outside in a few minutes to "hang out."

Brooks testified that he placed the beer in his refrigerator, checked on his baby, and prepared to go back outside to meet the victim. As he began to leave his apartment, he heard arguing and saw four or five men surrounding the victim. Brooks recalled that he saw a "short black male" wearing a maroon or red shirt holding a black gun, so he did not go outside but closed his front door. Brooks testified that after he closed the front door, he heard gunshots.

Brooks testified that he did not see the victim holding a gun during this altercation and that he had never seen the victim with a gun. Brooks recalled that, after hearing the gunshots, he opened his door again, and this time he saw the victim lying on the ground next to Brooks's car. Brooks instructed his wife to call police while he retrieved a blanket to place over the victim. When police arrived, Brooks identified himself as a witness and was placed in the back of a patrol car. Later, he was taken to a police station where he gave a statement.

On cross-examination, Brooks testified that Clifford Fowler arrived two or three minutes after the victim was shot.

Clifford Fowler testified that, at the time of his testimony, he was in jail for unrelated drug charges. Fowler said that the District Attorney's office had not offered any kind of deal in exchange for his testimony. Fowler explained that he was testifying because the victim, his friend, was killed.

Fowler testified that he had known the victim for about ten years before the victim was

3

fatally shot. On the night of November 4, 2008, Fowler said he was at Bent Tree Apartments "hanging out," watching the presidential elections results. As Fowler was standing in a breeze way, he overheard Deandre Speaks talking with Daniel Chapman. Speaks told Chapman that he was robbed and somebody made him strip during the robbery. Speaks described the robber to Chapman, and Fowler thought the description matched the victim. Fowler then called the victim and relayed to him that he had heard Speaks tell Chapman that the victim "set them up to get robbed." The victim denied any role in the robbery and said he was not going to talk about it over the phone. Before hanging up the phone, Fowler told the victim he was going to come over to Graceland Farm Apartments.

Fowler testified that he arranged for a ride to Graceland Farm Apartments and estimated that he arrived there just after midnight. Fowler said that the victim was out on his second story porch, and the two men met at the top of the stairs and talked about the robbery as they made their way down to the lower level of the building near the parking lot. The victim continued to deny any role in the robbery, stating that he too was robbed. The victim showed Fowler a gray automatic .45 handgun and told him that if the victim had been involved in perpetrating the robbery, he would have had the gun on him at the time. Fowler described the handgun as "unique" because most handguns are chrome or black and this one was gray.

As Fowler and the victim talked, the Defendant, Speaks, and Chapman approached them, with the Defendant aiming a gun at the victim as they approached. Fowler recalled that Speaks took the gray gun out of the victim's hand, looked at it, and told the Defendant and Chapman that it was the same gun used in the robbery. Fowler testified that Speaks then backed away from the victim and that Chapman stepped up and tried to pat the victim down. Fowler said that the victim grabbed Chapman's hand and pushed Chapman away. The victim emptied the contents of his pockets, which included a folded piece of paper and car keys, on the ground and told the men, "I told you I ain't got, I ain't got s*it on me neither." The victim told the men that he, too, was robbed. Chapman again moved toward the victim, but this time when the victim pushed Chapman away the Defendant fired a shot. Fowler recalled that both he and the victim began running in opposite directions. The victim ran toward his apartment building while Fowler ran toward the front entrance of the apartment complex. As Fowler ran, he heard five or six more gunshots in rapid succession.

Fowler testified that, when he reached the front of the apartment complex, he saw a car speed out through the entrance rather than the exit of the complex. Fowler said he cut back and headed toward the apartment building where he could see the victim lying on the ground. When Fowler reached the victim, he said there were about ten people who had gathered around the victim. Fowler shouted for someone to call 9-1-1 and then began talking with the victim. Fowler recalled that the victim said to him, "Tell me you ain't bring them folks down

4

here." Fowler told the victim that he would never do anything like that, and then the victim began to moan in pain and did not speak again.

Fowler testified that, once police officers arrived, he was placed in the back of a patrol car and that, after a few hours, he was taken to the police department to give a statement. Fowler said he "fabricated" several things in his first statement to police because he was afraid to give names or say "too much." He explained that he was afraid because the Defendant, Chapman, and Speaks knew he was present during the shooting. For this reason, Fowler was concerned for the safety of his family and believed that, "just like they went to [the victim's] house, they could come to [his] too." As a consequence, during the first interview with police, Fowler only provided the "street names" of the persons involved. Fowler identified his first statement that was entitled, "Homicide Defendant Statement." Fowler said that the detectives came back to him after the first statement and told him that they believed he was withholding information and that his unwillingness to cooperate led them to believe that he might be a suspect rather than a witness. Fowler said that he agreed to give a second statement that included actual names because he was not willing to go to jail for a crime he did not commit. After giving this second statement, Fowler identified the Defendant and Speaks in photographic line-ups.

Fowler testified that he had been brought to the courthouse the previous day in order to testify at this trial and was placed in a holding room between the court rooms. At the end of the day, Fowler learned that he would not be testifying until the following day. Fowler described the holding room where he had waited as having a solid door with a window. Fowler said that, at one point, Officer Mitchell briefly stepped out of the area, and the Defendant, wearing a green and navy blue stripe shirt and blue khakis, stepped around the corner and looked into the holding room where Fowler was waiting. Fowler testified that the Defendant whispered to Fowler, "[Speaks is] the shooter." The Defendant then asked Fowler if his bond was twenty thousand dollars and told Fowler that the Defendant's mother would provide his bond so Fowler could get out of jail by Friday. Fowler interpreted this conversation to mean, "Don't say nothing. [Speaks is] the shooter and if all go well with that, then I'll get somebody to bond you out." Fowler said he perceived this to be more like a bribe than a threat, and he said this was the only time that Fowler saw the Defendant on that day.

On cross-examination, Fowler testified that, after he overheard Speaks talking about the robbery, he received a phone call from "Rein."[2] "Rein" asked whether Fowler had spoken with the victim and whether Fowler was going to the victim's house. Fowler said that "Rein" told Fowler to "tell [the victim to] give that [gun] to [Speaks] [and the victim] ain't going to owe [Speaks] nothing." Fowler speculated that maybe "Rein" had spoken with both the

---

[2] Throughout the record this person is referred to only as "Rein."

victim and Speaks and arranged some form of settlement.

Nekitress Bernard, the victim's girlfriend, testified that she and the victim had a child together and that this child was two years old at the time of trial. In November of 2008, Bernard, the victim, and their child lived together at Graceland Farms Apartments. Bernard recalled that the victim had been employed at McDonald's restaurant for two years but was looking for another job. Bernard said that the victim was very involved with caring for their child and that he cooked and cleaned at home while Bernard was in school to become a medical assistant.

Bernard testified that her birthday is November 4 and that in the year 2008, it was also election night. Bernard recalled that, on the night of November 4, they were barbecuing in celebration of her birthday. The victim and Frederick Brooks, the next-door neighbor, were outside on the porch barbecuing chicken. Bernard recalled that the election news was still on when she fell asleep between 8:00 p.m. and 9:00 p.m. while the victim was on the porch. She recalled hearing the phone ring at some point and hearing the victim say "he was on his way" as he walked out the door of their apartment. Bernard said that the victim was speaking with Clifford Fowler and that she did not know where the victim was going when he left but that she assumed "it couldn't [have] been too far" because he did not lock the front door. Bernard said she must have "dozed back off" again and was awakened by four or five gunshots. She perceived the shots to be "close" to the apartment.

Bernard testified that, as she ran to the door, her neighbor Frederick Brooks came into the apartment and told Bernard that the victim was shot. Bernard recalled that she went outside but said it was "like [she] was dreaming," so she walked back into the house. She said, "Everything was just foggy. I mean it was like seeing something that I wasn't supposed to see." Bernard called 9-1-1 and provided information about the victim. She recalled that people were outside with the victim, but she said she did not know most of them.

Police arrived on the scene and searched Bernard's home for a gun, but they were unable to locate one. Bernard testified that her children were asleep, so she remained at the apartment with the children after the victim was transported to the hospital. She learned upon making a phone call to the hospital that the victim had been taken into surgery. It was not until the next morning when she went to the hospital to see the victim that she learned that he was dead. After going to the hospital, Bernard went to the police department and gave a statement to police. Later, she returned to her family's home because she was afraid to return to her apartment. Bernard explained, "I [ ] didn't know what was going on. I didn't know if someone was going to come do something to me or try to do something to me or my kids." Due to her fears, she moved out of the apartment building.

On cross-examination, Bernard confirmed that she had not completed her medical assistant program because of these events. Bernard testified that when she went outside and saw the victim lying on the ground, she recognized both Clifford Fowler and Frederick Brooks in the crowd surrounding the victim. Bernard recalled seeing Fowler running from the main entrance of the complex toward the buildings. Fowler went up to the victim, and, although Bernard could not hear what they were saying, she could see Fowler talking with the victim. Later, Bernard saw police officers place Fowler and Brooks in two separate police cars, but she did not see police officers speak with either man.

Shaquita Scott testified that she knew the Defendant through her nephew Deandre Speaks. On the night of November 4, 2008, Scott and two of her friends, Ronda Thomas and Anitra Totton, went to Scott's parents' home. When they arrived, Scott saw her two brothers, her nephew, Speaks, and the Defendant talking outside of the house. Scott said they were talking about the fact that they had been robbed, and she recalled that the men did not have any clothes. Speaks asked Scott to take him and the Defendant to CoventryApartments to get some clothing, and she agreed. After Scott took the men to retrieve clothing, Speaks asked Scott to take the two men to Bent Tree Apartments.

Later that night, Scott received another phone call from Speaks, who asked her to pick him up at Bent Tree Apartments. Scott, still with her two friends, agreed to pick him up. When she arrived at the apartment complex, Speaks was accompanied by the Defendant, and both men got into her car and rode back to Scott's house. Scott said that, when she picked the two men up at theApartments, she was driving, her friend Thomas was in the passenger seat, and the two men got in the back seat of the car with Totton. Scott said that the Defendant was on his cell phone when he got into the car and Scott heard him saying, "Man, I burnt the n***** ass. Mother****** ain't fixing to rob [the Defendant]," and "I killed him, yeah, it's a done deal now." Speaks then told everyone in the car to "shut up" and for the Defendant to "be quiet," and Thomas turned up the radio. Scott recalled that the Defendant repeated the phrase "I burnt that n***** ass" several times. Scott interpreted this phrase to mean that the Defendant had shot someone. Scott gave a statement to police and identified the Defendant in a photographic line-up as the man who "shot the guy who robbed him."

On cross-examination, Scott testified she did not recall exactly what the Defendant and Speaks were wearing after they changed at Coventry Apartments, although she thought they were wearing dark clothing. Scott maintained that, even though her statement to police referred to Speaks as wearing jeans and a t-shirt and the Defendant as wearing dark pants and a white hoodie, she did not remember what the men were wearing that night. Scott said that, when she left the two men at Bent Tree Apartments, she watched them walk toward a white

Malibu where Fowler and "Erwin"[3] were before she drove away.

Scott testified that she did not see either Speaks or the Defendant with a gun either before she dropped them off or later when she picked them up from Bent Tree Apartments. Scott said that, after she picked the men up, they all returned to her house and were talking. Her father came in and told everyone they needed to quiet down, and, shortly thereafter, the Defendant and Speaks left in a white Grand Am. Scott said that she went to the police station to give a statement because her brother, who initially was a suspect, told her that if she knew something she needed to tell the police. Scott said she did not become aware that police were also questioning her nephew until he called her from jail.

Ronda Thomas testified that she was in the car early in the morning of November 5, 2008, when Scott picked up the Defendant and Speaks at Brent Tree Apartments. Thomas said that she heard the Defendant say, "I burnt that trick." Thomas said she did not know what the Defendant meant when he said, "I burnt that trick," because she was not really paying attention at the time. On cross-examination, Thomas said that, when they dropped the Defendant and Speaks off at Bent Tree Apartments, she watched the two men get into a four-door white car.

David Payment, a Memphis Police Department officer, testified that he was a crime scene investigator. Officer Payment said that he responded to a "critical shooting" call at the Graceland Farms Apartments in November 2008. Officer Payment identified a computer-generated crime scene diagram that he had created of the apartment complex, the car with gunshot damage, and a sketch indicating where evidence was located at the crime scene. Officer Payment testified that at the scene he collected spent .40 Smith and Wesson casings, spent .45 casings, spent bullet fragments, one white tennis shoe, two quarter coins, and a nickel coin. Officer Payment testified that he received items medical personnel collected as personal effects of the victim at the hospital. These items included: one magazine with several live .45 rounds in it, one white piece of paper, one white lighter, and one brass-colored key on a black cord.

Dr. Karen Chancellor, Chief Medical Examiner for Memphis and Shelby County, testified as an expert witness in the field of forensic pathology. Dr. Chancellor testified that the victim in this case sustained five separate gunshot wounds. The entry wounds were located on the left side of the victim's back, his right buttock, his right shoulder, the lower right leg, and his left ankle. The gunshot wounds to the back and right buttock were

---

[3] The transcript reflects that the witness says, "[S]omebody else name[d] 'Erwin,' 'Aaron,' however you say the name." Because this witness later refers to this person as "Erwin," we will refer to him as "Erwin."

penetrating gunshot wounds where the projectile entered and stayed in the body. These projectiles were recovered from the victim's body. The gunshot wounds to the right shoulder, right leg, and left leg were perforating gunshot wounds where the bullet entered and exited the body. Dr. Chancellor testified that the cause of death was multiple gunshot wound injuries and that the manner of death was homicide.

Jaydin Banks, the Defendant's girlfriend, testified that the two had been dating for three years. Banks said that in November 2008, the Defendant told her that he had been robbed although he did not tell her anything about the incident, and she did not ask. When asked why she did not inquire as to any details, Banks said, "We never did get into that with each other."

Banks testified that on January 19, 2009, she was living at 2402 Saint Elmos and police officers came to her home asking for the Defendant. Banks told police officers that the Defendant was not in her home but consented to a search. Upon search of the house, police officers located the Defendant in a closet in the rear back bedroom. Banks acknowledged that she knew the Defendant was in the house and that she lied to police officers when she said he was not in the house. Despite a police report to the contrary, Banks denied ever telling police that she lied about the Defendant's presence in her home because he threatened to kill her. When asked why she lied to police about the Defendant's presence in her home, Banks explained, "[A]t the time I was pregnant and I had already had one miscarriage so, therefore, I mean, I didn't know anything that was really going on." Banks acknowledged that, even though the Defendant had not told her about "the murder," she had seen news reports indicating police were looking for the Defendant.

James Howard, a Memphis Police Department officer, testified that on January 19, 2009, he went to 2402 Saint Elmo in Memphis, Tennessee, based upon a tip from Crime Stoppers. Officer Howard, along with other officers, knocked on the front door. Banks answered the door appearing nervous and denied that the Defendant was in the house, but she consented to a search of the home. Upon search of the residence, police officers found the Defendant in the back bedroom closet. Police officers instructed the Defendant to come out of the closet, and the Defendant complied. The Defendant provided officers with a fake name and indicated that the person they were looking for had fled out the back window. Officer Howard said that he knew this was false because police had set up a perimeter around the house, and two to three officers were located at the back of the house. The Defendant provided officers with a false driver's license, but Banks gave the police officers the Defendant's correct birth date to confirm the Defendant's identity. Officer Howard said that when Banks was told that she could possibly face charges for harboring a fugitive, she told police officers that the Defendant had threatened to kill her if she turned him in.

Tony Mitchell, a Shelby County Sheriff's Department deputy, testified that he was assigned to courtroom security. Deputy Mitchell explained that part of his duty was to escort inmates to the courthouse and that he made sure to separate any witnesses for the trial from the Defendant. Deputy Mitchell testified that on the previous day, he escorted the Defendant's attorney to the holding area between the courtrooms to speak with the Defendant. At this time, Fowler was also in a holding room in this area. When defense counsel finished meeting with the Defendant, Deputy Mitchell escorted defense counsel back to the courtroom, which caused him to leave the holding area for approximately thirty seconds. Deputy Mitchell testified that the Defendant was waiting in the hallway while the deputy stepped outside of the holding area. After Deputy Mitchell returned from escorting defense counsel out of the holding area he took the Defendant downstairs and then returned for Fowler. Deputy Mitchell said that Fowler told him that the Defendant had told Fowler that someone else was the shooter and that someone would post Fowler's bond.

The State offered into evidence an audio tape and a transcript of the audio tape of the Defendant's phone calls made from jail. On these recordings, the Defendant is speaking to a woman identified as "Unknown 2," who apparently used a three-way calling feature to connect the Defendant with multiple people at the Defendant's direction. Throughout the conversations, the Defendant berated Unknown 2 for not calling witnesses to tell them not to attend the Defendant's preliminary hearing as he had asked her to do. After the Defendant instructed Unknown 2 to place the first phone call to a third party, he spoke with this third party and asked that they contact Fowler and Speaks. The Defendant then engaged in the following exchange with Unknown 2:

> The Defendant: Why you can't do simple s***? You see how easy that was, fool?
>
> Unknown 2: (inaudible)
>
> The Defendant: Can't stand up for s*** . . . you didn't attempt[ ] to call a mother f***er . . ."
>
> Unknown 2: What?
>
> The Defendant: You ain't even attempted to call a mother f*****, so . . . I'm just wasting on my mother f***ing breath. Then, you give me these bogus a** numbers. Soon as . . . the soon though . . .as if I was to call another bitch and had her do it or something, it'll be a problem, though.

10

| | |
|---|---|
| Unknown 2: | No, Damien, it would not, would not do anything . . . |
| The Defendant: | Just, to, to be real with you boo, I damn, damn sure today, boo . . . I was gone do it.  I promise to Robert and them to go on and cut your water completely off, girl, cause you don't care, Tee Tee.  You writing me this bull s\*\*\* in these mother f\*\*\*ing letters, hoe, but you can't . . . all I asked you to do, dog, is call this number, Bro . . . and tell these folks I go to court . . . |

The Defendant instructed Unknown 2 to place several more phone calls for him, but continued to criticize Unknown 2 for her failure to contact witnesses and discourage them from appearing at the Defendant's preliminary hearing.

| | |
|---|---|
| Unknown 2: | Mane, you hurt (inaudible) you say it every time, (inaudible) |
| The Defendant: | What? I say it . . . cause (inaudible) I ain't talked to you in two days, bro . . . you ain't accomplished s\*\*\*, bro . . . |
| Unknown 2: | You just cuss every time you talk to me . . . you . . . and I sit up here and I take all this s\*\*\* and you still gone do what the f\*\*\* you want to do.  (inaudible) |
| The Defendant: | You take all what . . . what, what s\*\*\* Kee Kee?  I ain't even did s\*\*\* since I been locked up, so what you mean you take all this s\*\*\*?  I ain't did s\*\*\*, bro.  You can't even take care . . . I asked you to do the s\*\*\*, you tell me yeah, you gone do it, but then dawg, you can't even take care of the simple s\*\*\*.  Damn, what's up, girl . . . but you writing this s\*\*\* in this letter . . . you gone be down and you don't make promises you can't keep, and you gone keep your promise and all this s\*\*\*, but, but you can't call nan' motherf\*\*\*er, though . . .that's coming to my court date.  You can't call nan' - nobody. |

The audio recordings contain portions of conversations with ten different individuals wherein the Defendant is either asking the person to make contact with a witness to tell the witness not to appear at the Defendant's preliminary hearing or the Defendant is expressing

11

anger that the person has not made contact with witnesses as the Defendant requested. The following are excerpts of the requests the Defendant made:

> The Defendant: It's some numbers and s*** I need ya'll to call, Mane, and tell them folks to don't come to court and s*** . . .
>
> Unknown 5: Okay . . .
>
> . . . .
>
> The Defendant: Well, uh, but I need you to write this number down, right . . . whenever I get off the phone with you, I need you to call them and tell her uh, don't come. You hear me?
>
> Tee Tee: Don't come . . .
>
> The Defendant: Yeah.

In one of the conversations, the Defendant alludes to paying $1000 for a witness not to attend the preliminary hearing. The Defendant instructs different people to call Shaquita Scott, Clifford Fowler, and Daniel Chapman and tell them "don't come" to the preliminary hearing. During one phone call, the Defendant leaves a voice message informing the recipient of his court date and instructing that Fowler should be contacted and told not to appear in court.

Joseph White, a Memphis Police Department officer, testified that he reported to the scene at Graceland Farms Apartment and, while there, took notes for his police report. Officer White said that, although he did not interview anyone personally, he gathered information from other officers and included that information in his police notes. Officer White read the following from his notes, "Clifford Fowler advised that after one suspect had tried to get the victim's wallet a couple of times [Speaks] pointed the gun at the victim and fired a shot." From another portion of his notes, Officer White read the following: "Frederick Brooks advised that he saw five to six suspects run up to the victim but only . . . saw one suspect with a gun wearing a red T-shirt." Officer White testified that, according to his notes, Fowler had told officers that one of the suspects approached "from the east side and the other two came around from the apartment building."

On cross-examination, Officer White described the crime scene as "hectic," with twenty to thirty people immediately surrounding the victim and more people on the "outskirts." Officer White explained that it was due to the large crowd that so many officers

12

were present on the scene to ensure safety.

The Defendant testified that he made the phone calls asking others to make contact with key witnesses because he was in jail for something he did not do. He said that, because the other witnesses were released after they gave their statements, he believed that, if no one showed at his preliminary hearing, he would be released. The Defendant said that he never asked anyone to lie or be untruthful, explaining that he "was just scared."

The Defendant then testified about the events leading up to the victim's murder. The Defendant said that, between 8:00 p.m. and 9:45 p.m, he, Deandre Speaks, Quandrom Scott, Eldridge Scott, and Keon Scott were shooting dice at Eldridge Scott's apartment complex, Graceland Farms Apartments. Another game was being played upstairs, and, after a while, two of the men who had been playing upstairs, one of whom was the victim, came downstairs and joined their game. About five to ten minutes after the victim had joined the game, a man approached, grabbed Quandrom Scott, and, while holding him at gunpoint, ordered everyone else to get on the ground. The man then approached the Defendant, put a gun to the back of the Defendant's head, and ordered him to remove his clothing. Two more men approached, appearing to be with the armed man, and "[were] supposed to [be] patting down Deandre Speaks, Eldridge Scott, and Keon Scott." The Defendant said that he believed that the two men became nervous because they ran from the scene before patting the men down. When the two men fled, the victim ran after them, leaving only the man carrying a gun who had initially arrived. The Defendant said that, at this point, the man carrying a gun picked up all the clothing by himself and ran back in the direction from which he had come.

The Defendant testified that the police were called and that the Defendant provided information about the robbery for the police report. After police officers left, Eldridge Scott drove the Defendant, Speaks, Quandrom Scott, and Keon Scott to Quandrom and Keon's house. After arriving at Quandrom and Keon's house, Speaks asked his aunt, Shaquita Scott, to drive Speaks and the Defendant to Speaks's apartment to get some clothing. Scott agreed and took the two men to Coventry Apartments where Speaks put on grey jeans and a black and gray striped jacket and the Defendant put on jeans and a white hoodie. While the men were changing, Speaks called "Rein" and told him about the robbery at Graceland Farms Apartments. "Rein" gave Speaks Fowler's phone number and instructed him to call Fowler. Speaks called Fowler and, as a result of the conversation, Speaks asked Scott to drive the two men to Bent Tree Apartments.

The Defendant testified that, when they arrived at Bent Tree Apartments, ten people were outside, and Daniel Chapman arrived right after them. Speaks spoke with Fowler and "Rein" about the robbery. The Defendant said that Fowler indicated that he knew who had robbed them. Fowler then placed a phone call to the victim and activated the speaker phone

feature, so everyone could hear the conversation. Fowler asked the victim where the gun was that Fowler had lent the victim. The Defendant said that Fowler believed the robber used the gun Fowler loaned to the victim in the robbery. As a result of the conversation, three cars went to Graceland Farms Apartment. Fowler rode in the Malibu, Speaks and the Defendant rode in Scott's car, and Chapman rode in a Taurus. Shaquita Scott dropped off Speaks and the Defendant at the front of the apartments, the Defendant got into the Malibu, and Fowler got into the Taurus with Chapman and Speaks. The Malibu pulled up very close to the victim's apartment, while the Taurus parked at the corner of the apartment buildings. Fowler, Speaks, Chapman, and Ira went to speak with the victim while the Defendant remained in the Malibu. He said he rolled the window down so he could hear the conversation. The Defendant watched as Fowler took a gun from the victim and showed it to Speaks, and Speaks confirmed that the gun was the one used in the robbery. The Defendant was summoned from the Malibu to identify the weapon. The Defendant said the gun used in the robbery was very distinct. He said the gun was a "black and brown automatic" and that the hammer of the gun and the handle were brown.

After the Defendant confirmed that it was the weapon from the robbery, "an argument [ ] broke out." The victim denied any role in the robbery and said that he too was robbed. Chapman tried to check the victim's pockets, but the victim pushed Chapman away. Fowler told the victim to "give [Speaks] something." The victim at one point threw some change, a piece of paper and an EBT card on the ground. The Defendant said that, "after they got through arguing or whatever[,] Chapman just instantly came up with the gun and he shot the victim" in his back, and the victim stumbled. Everyone backed up except for Chapman, who began firing again. The Defendant recalled that Fowler ran and got into the Malibu while Speaks, Ira, and the Defendant got into the Taurus. The Defendant said that he heard more shots, but then Chapman got into the Taurus too, and they sped away. The Defendant estimated that he heard a total of between three and six shots.

The Defendant testified that everyone except Fowler returned to Bent Tree Apartments after the shooting. At the time, the Defendant did not know where Fowler was but later learned that Fowler had gotten out of the Malibu to return and retrieve the gun. The Defendant said that he and Speaks were at Bent Tree Apartments for only ten to twenty minutes while they waited for Shaquita Scott to pick them up. The Defendant denied that there was any conversation about the shooting in Scott's car. Scott drove Speaks and the Defendant back to her parents' house where the two men waited for fifteen or twenty minutes for Cheryl Wright, the Defendant's friend, to pick them up. Wright drove Speaks to Coventry Apartments and then drove the Defendant to a friend's house in East Memphis.

When asked why he did not report these events to the police, the Defendant said it was because he was not the "actual shooter," but he was afraid police might consider him

"involved" because he was present and witnessed the shooting.

The Defendant denied seeing or speaking to Fowler during the trial while Fowler was in a holding room. The Defendant testified that he was arrested after police officers found him in the back bedroom closet at his girlfriend's house. The Defendant explained that he was hiding because a Sheriff's Department deputy had told the Defendant's mother that if the Defendant "was anywhere in the opening that they would blow my f***ing head off." The Defendant said that twelve to fifteen police cars were at Banks's house, and police officers came to her front door with weapons drawn. He denied telling Banks to tell the police that he was not there and denied making any threats to Banks. The Defendant said he told police officers that an identification card retrieved from his pocket was his, even though it was not, because he did not want to go to jail.

The Defendant agreed that he had previously been convicted of reckless endangerment with a deadly weapon. The Defendant said this conviction was based on his shooting a .38 revolver into the air at a park at night. The Defendant said that no one was around when he did this and that he was given a sentence of one year, eleven months, and twenty-nine days for this conviction.

Based upon this evidence, the jury convicted the Defendant of facilitation of second degree murder.

The trial court held a sentencing hearing and found three enhancement factors applicable in this case: enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of this offense; and enhancement factor (16), that the Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. T.C.A. § 40-35-114(1), (9), and (16) (2006). The Defendant did not submit any mitigating factors for consideration, and the trial court found none applicable. The trial court sentenced the Defendant as a Range I, Standard Offender and ordered the Defendant to serve the maximum sentence of twelve years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the trial court erred when it denied his motion to exclude recorded telephone calls the Defendant made from jail; (2) the evidence is insufficient to support his conviction; and (3) the trial court erred in applying enhancement factor (9) to the Defendant's conviction.

## A. Admission of Recorded Telephone Calls

The Defendant contends that the trial court erred in denying his motion to exclude from evidence recorded telephone calls made by the Defendant from jail. The Defendant asserts that the recorded phone calls were not probative of any element of the crime of facilitation of second degree murder and were unfairly prejudicial because the transcript of the phone calls were replete with expletives and verbal abuse. The State responds that, because this evidence reveals an inconsistency with the Defendant's claim of innocence and also demonstrates the Defendant's consciousness of guilt, its probative value outweighs the danger of unfair prejudice.

After reviewing all of the tape recordings and transcripts, the trial court determined that some of the conversations were not relevant and denied their admission on that basis. As to portions of the recorded phone calls that evidenced the Defendant's attempt to prevent witnesses from testifying at his preliminary hearing the trial court made the following findings:

> [The Defendant]'s attempts to suppress witnesses testimony goes directly to the consciousness of guilt.
>
> I think it comes in under 403. But under 404(b) it's a much more lenient standard for admissibility. It's that the probative value not be outweighed by the danger of unfair prejudice. And clearly the probative value is not outweighed by the danger of unfair prejudice in my opinion. All these attempts[,] keeping his girlfriend on the line and making her make all these phone calls, third party calls, constantly trying to [ensure] that the witnesses, key witnesses not appear is not outweighed by the danger of unfair prejudice.
>
> And under 403, I'm sorry, get the standard here. It would only be excluded if the probative value is substantially outweighed by the danger of unfair prejudice. So it's relevant, it's probative and it's admissible.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. Such evidence is admissible for other purposes, however, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that

16

defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually at issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. *See id*. Where the procedures "are substantially followed, the trial court's decision will be given great deference and will be reversed only for an abuse of discretion." *Id*. at 759; *see also State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

"Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978). "Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." *State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002).

The trial court held several hearings, outside the presence of the jury, on the subject of these audio recordings of the Defendant's phone calls. In the portions admitted into evidence at trial, the Defendant specifically asked the person with whom he is speaking to contact key State witnesses, such as Scott, Fowler, and Chapman, to tell them not to come to court to testify. During one such conversation, the Defendant even goes so far as to mention the payment of $1000 as incentive for Fowler or Chapman not to testify against the Defendant at the preliminary hearing. The trial court found that a material issue existed other than this conduct conforming with a character trait, which was the Defendant's consciousness of guilt. The trial court did not specifically state that it found the Defendant's conduct had been proven by clear and convincing evidence; however, the Defendant's admission that he made the phone calls in an attempt to prevent witnesses from testifying constitutes "clear and convincing" evidence that the Defendant attempted to discourage witnesses from testifying against him. Because this evidence both reveals the Defendant's consciousness of his own guilt and contradicts his claim of innocence, we conclude, as did the trial court, that the audio recordings are relevant, and their probative value is not outweighed by the danger of their prejudicial effect. We conclude that the trial court did not abuse its discretion, and thus the Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant asserts that there was no evidence that the Defendant knew that the victim was going to be shot or that the Defendant furnished substantial assistance in the victim's murder, which are essential elements of his facilitation of second degree murder

17

conviction. The State responds that, even if the evidence is insufficient for a conviction on the lesser included offense of facilitation of second degree murder, the conviction should still stand because the evidence supports a conviction for the greater indicted offense of second degree murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was indicted for second degree murder, which is defined as "a knowing killing of another." T.C.A. § 39-13-210(a)(1) (2006). The jury convicted the Defendant of the lesser-included offense of facilitation to commit second degree murder. A person may be convicted of facilitation of a crime where, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.CA. § 39-11-403(a) (2006).

The evidence, considered in the light most favorable to the State, proves that the Defendant, along with some other men, went to confront the victim at his apartment about a robbery that had occurred earlier in the evening. The Defendant approached the victim with a gun drawn while Speaks took a gun from the victim, and Chapman checked the victim's pockets. When the victim repeatedly denied any part in the robbery and showed the men there was nothing in his pockets, the Defendant shot the victim five times before fleeing. The victim was then transported to the hospital where he died as a result of the gunshot wounds. The evidence would have supported a conviction of second degree murder and certainly supports a conviction of facilitation of second degree murder. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the was Defendant guilty of the facilitation of second degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

### C. Sentencing

The Defendant asserts that the trial court improperly applied enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of the offense, arguing that the jury's convicting the Defendant of the lesser included offense of facilitation of second degree murder necessarily means that the Defendant was not the actual shooter, and therefore did not possess or employ a firearm during the commission of the offense. The State responds that the trial court properly found that the record established by a preponderance of the evidence that the Defendant possessed or employed a firearm during the commission of the offense.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401,

19

Sentencing Comm'n Cmts (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T. C A. § 40-35-103 (2006); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The Tennessee Code allows a sentencing court to consider the following enhancement factors, as relevant to this case, when determining whether to enhance a defendant's sentence:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . . .

(9) The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense;

. . . .

(16) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult;

T.C.A. § 40-35-114(1), (9), and (16) (2006). If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114. In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if

any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e). Particularly relevant to the Defendant's complaint is our Supreme Court's holding that:

> [A] sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence.

*State v. Winfield,* 23 S.W.3d 279, 283 (Tenn. 2000).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. See 2005 Tenn. Pub. Acts ch. 353, §§ 8-9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *Carter*, 254 S.W.3d at 343.

The Defendant was sentenced as a Range I, Standard Offender and was convicted of a Class B felony, which subjected the Defendant to a sentencing range of eight to twelve years. *See* T.C.A. § 40-35-112(a)(2). The trial court applied enhancement factor (1), that the Defendant had a previous history of criminal behavior in addition to those necessary to establish his range; enhancement factor (9) that the Defendant employed a firearm during the commission of the offense, and enhancement factor (16) that the Defendant had a juvenile history that included offenses that would be considered felonies if committed by an adult. T.C.A. § 40-35-114(1), (9), and (16). After consideration of the evidence at trial, the presentence report, the sentencing principles and arguments, applicable enhancement and mitigating factors, the facts and circumstances surrounding this offense, and the Defendant's potential for rehabilitation, the trial court sentenced the Defendant to twelve years in the Tennessee Department of Correction.

The Defendant does not challenge the trial court's application of enhancement factors (1) and (16), thus, we address only the application of enhancement factor (9). At the conclusion of the sentencing hearing, the trial court found that the testimony that the Defendant had a gun was credible, and it applied enhancement factor (9). The trial court went

on to say, "[T]he proof was clear that [the Defendant] did in fact fire and shoot and kill the victim in this case."

In this case, we conclude that the evidence supports the trial court's application of enhancement factor (9). Fowler testified at trial that the Defendant approached the victim with his gun drawn, and after the victim's repeated denial of any role in the previous robbery, the Defendant shot the victim multiple times. Additionally, Scott testified that the Defendant, while speaking to someone on the phone, stated that he had shot and killed the victim. This evidence supports the application of enhancement factor (9).

The Defendant complains that the jury's acquittal on the charge of second degree murder precluded the trial court from finding that the Defendant possessed a firearm. A trial court applying pre-2005 sentencing law cannot enhance a defendant's sentence above the presumptive minimum unless the facts relied upon to support the enhancement were found beyond a reasonable doubt by a jury or trial court, if the defendant waived his right to jury determination. *See State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007). The sentencing laws used in this case, however, are the 2005 amended sentencing laws that removed the requirement that trial courts make factual findings before enhancing a sentence from the presumptive minimum sentence. T.C.A. § 40-35-210 (2006). Under the new act, the trial court shall set a sentence within the range, and the length should be adjusted for appropriate enhancement or mitigating factors. *Id*. In doing so, the court "shall consider" advisory sentencing guidelines, such as adjustment for appropriate mitigating and enhancement factors, but is "not bound by" them. *Id*. Thus, the fact that the jury did not find beyond a reasonable doubt that the Defendant possessed a firearm does not preclude the trial court from finding by a preponderance of the evidence that the Defendant possessed a firearm during the commission of this offense. Accordingly, the evidence supports the application of this enhancement factor; therefore, the Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the Defendant's conviction and sentence.

_____
ROBERT W. WEDEMEYER, JUDGE

22